**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**
**(SOUTHERN DIVISION)**

| | |
|---|---|
| **AMARYLLIS, INC.**<br>3701 West Street<br>Landover, Maryland 20785<br><br>    *Plaintiff,*<br><br>v.<br><br>**PERRY ADLER**<br>6528 Cavalier Drive<br>Alexandria, Virginia 22307<br><br>    *Defendant.* | Civil Action No. _____ |

## COMPLAINT

Plaintiff, Amaryllis, Inc. (the "Plaintiff" or the "Company"), by counsel, hereby files this Complaint against Defendant, Perry Adler (the "Defendant"), and states as follows:

### INTRODUCTION

1.     Violating the fiduciary duties inherent to his position as the Company's Chief Financial Officer, the Defendant fraudulently and purposefully stole millions of dollars from the Company by, among other things, misusing corporate credit accounts for personal purposes then paying off these expenses with corporate funds.  The Defendant concealed his fraudulent conduct by abusing the trust placed into him, exerting sole control over the Company's financial accounts, and intentionally misleading the Company's leadership.  The Company requests the entry of judgment in its favor and against the Defendant for fraud (Count I), conversion (Count II), negligence (Count III), and breach of fiduciary duty (Count IV), with punitive damages.

### PARTIES

2.     The Plaintiff is a District of Columbia corporation with a principal office at 3701 West Street, Landover, Maryland 20785, and is authorized to conduct business in the State of

Maryland.

3. The Plaintiff is a premier floral and event design studio.

4. The Defendant is, upon information and belief, a U.S. citizen domiciled in Virginia, with a last known address of 6528 Cavalier Drive, Alexandria, Virginia 22307.

5. Upon information and belief, the Defendant is also the owner of that certain real property commonly known as 33425 W Cowboy Clint Way, Seligman, Arizona 86337.

6. Until recently, the Defendant was employed as the Chief Financial Officer for the Plaintiff working primarily in Maryland.

## JURISDICTION AND VENUE

7. This Court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the Plaintiff is a District of Columbia corporation with a principal office in Maryland, the Defendant is a citizen of Virginia, and the amount in controversy exceeds $75,000.

8. Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events giving rise to the Plaintiff's claim occurred in the Southern Division of the District of Maryland.

## FACTS COMMON TO ALL COUNTS

*A. General Background*

9. The Company was formed as a privately held floral and event design business by filing Articles of Incorporation with the Secretary of the District of Columbia, recorded March 2, 1989.

10. The Company has since grown into a leading full-service event design company producing high quality events throughout the East Coast.

11. The Company hired the Defendant as its Chief Financial Officer ("CFO") in

2014.

12. Prior to becoming CFO, the Defendant worked for several years as a corporate controller for various companies in which he oversaw accounting and financial functions.

13. The Defendant acted as the Company's CFO for over 10 years until his recent termination.

14. As CFO, the Defendant was responsible for managing the Company's finances, accounting functions, payroll employee, benefits functions, and compliance.

15. The Defendant directly interacted with the Company's accounting firm and was the only individual designated at the Company to do so.

16. The Defendant personally and directly managed all of the Company's financial and credit accounts, including, but not limited to, Bank of America credit card accounts for several Company employees (the "Company Credit Accounts"), the Company's Bank of America checking account (the "Company Checking Account"), and the Company's accounts with third parties, such as The Home Depot, Marriott, and Enterprise (collectively, the Corporate Accounts").

17. The Defendant directly reported to the owner of the Company.

18. The Defendant was responsible for and regularly accessed and used the Corporate Accounts.

19. Until recently, the Defendant was the only individual at the Company with login credentials for the Corporate Accounts.

20. The Defendant was a named credit card holder of one of the Company Credit Accounts (the "Credit Account").

21. Due to the Defendant's position as CFO and employment responsibilities, the

Credit Account had a credit limit of $120,000.00, substantially greater than the credit limits of most other Company Credit Accounts, which was intended to allow him to facilitate larger transactions for the Company.

22. The Company's employees are advised that they may use the Company Credit Accounts only for the Company's legitimate business reasons and must promptly reimburse the Company for any personal expenses charged to the Company Credit Accounts.

23. The Company's practice is to hold weekly meetings (the "Weekly Meetings") amongst its leadership to verbally discuss important items, such as upcoming events.

24. The Weekly Meetings also served as the primary mechanism for the Defendant to keep the Company's executive management updated about the Company's financial affairs.

25. The Weekly Meetings were generally not reduced to writing.

26. Generally, the Defendant did not provide written reports about the Company's finances at the Weekly Meetings.

27. The Company's executive management also held a yearly review (the "Yearly Reviews") with the Defendant to discuss the Company's financial affairs.

28. The Yearly Reviews were generally not reduced to writing.

29. Generally, the Defendant did not provide written reports about the Company's finances at the Yearly Reviews.

30. Consistent with the customary roles of a CFO, the Company's executive management expected the Defendant to provide true, complete, and accurate financial information regularly throughout the calendar year and act solely in the Company's best interests.

**B. *Events Preceding Discovery of the Fraud***

31. The Company experienced success in the initial years of the Defendant's employment as CFO, with its events garnering features in the New York Times, Washingtonian, Vogue, Architectural Digest, People, Vanity Fair, and many others.

32. However, in recent years, particularly after the COVID-19 pandemic, the Company began experiencing financial difficulties.

33. These financial difficulties gradually increased over time despite the Company's services being in high demand and receiving positive feedback from high-profile clients.

34. At the Weekly Meetings and the Yearly Reviews, the Defendant consistently attributed the Company's financial difficulties to market changes, such as increased costs for labor and materials.

35. As the Company's financial situation became more dire, particularly throughout 2023 and 2024, the Company increased its sales and operations seeking to overcome the purported expense increases, in reliance of the Defendant's representations that the Company's increasing expenses were legitimate.

36. The Company's increased sales and customer commitments initially distracted executive management from investigating the information that the Defendant was providing at the Weekly Meetings and Yearly Reviews.

37. The Defendant encouraged the Company to increase its sales and operations to better conceal his fraudulent activity and increase his potential for personal gain.

38. Throughout this period, the Defendant represented at the Weekly Meetings and Yearly Reviews that the Company's reduced profit margin was due to increasing legitimate business expenses.

39. The Defendant particularly attributed the Company's financial difficulties to

growing costs for labor and materials.

40. The Defendant frequently offered excuses blaming the Company's inherent expenses and made vague promises that he would improve the Company's profitability.

41. As the Company's concerns grew, the Company began requesting that the Defendant provide written analyses and more details of the Company's expenses and financial status.

42. The Defendant avoided providing written analyses of the Company's expenses or financial status.

43. The Defendant avoided providing such written analyses intentionally to avoid scrutiny of his activity.

44. When asked directly about the Company's finances, the Defendant made innumerable false or misleading representations, described in detail below.

45. The Defendant made such representations intentionally to perpetuate and conceal his fraudulent scheme that was costing the Company dearly.

C. *Discovery of the Fraud*

46. In February of 2025, the Defendant went on vacation in Southeast Asia.

47. Upon information and belief, the Defendant spent this vacation time primarily in Thailand.

48. The Defendant has travelled to Thailand and Southeast Asia numerous times recently for personal travel.

49. Upon information and belief, the Defendant's travel to Southeast Asia was for medical procedures such as liposuction.

50. The Defendant recently married a woman from Thailand named Jintana

Pornpatsaranont (a/k/a Jintana Adler).

51. Jintana Pornpatsaranont has family in Southeast Asia.

52. Because of the fraudulent conduct described herein, and the Defendant's connections to Southeast Asia, the Company is concerned that the Defendant may be a flight risk.

53. While the Defendant was on vacation in February of 2025, the President of the Company accessed the Defendant's Credit Account online, which reflected monthly records for the period of January of 2024 to present.

54. The Defendant's misuse of several of the Corporate Accounts became quickly apparent, although its full extent is still under investigation as the Company continues to collect records.

55. **For the period of January of 2024 to January of 2025, the Defendant's fraudulent conduct cost the Company more than One Million Dollars ($1,000,000).**

56. The damage caused by the Defendant forced the Company to take out loans to cover its expenses, some of which are directly attributable the Defendant's fraudulent conduct.

57. Due to the nature of the conduct, the Company strongly suspects that the Defendant's fraudulent activity commenced prior to 2024.

58. The Defendant's practice was to brazenly charge numerous personal expenses to the Credit Account, then pay off these expenses periodically with lump sums that he transferred from the Company Checking Account.

59. The Defendant did not deposit personal funds in the Company Checking Account to reimburse the Company for the personal expenses charged to the Credit Account.

60. Instead of legitimate business expenses for the Company, the Defendant was

using the Credit Account to pay for, among other things, luxury goods, medicine, pets, travel, and household expenses.

61. The vast majority of these charges could not possibly be for company purposes.

62. The Defendant made these charges as if the Company's funds were his own.

63. The Defendant conducted his fraudulent scheme carefully to ensure that payroll needs were generally met, the credit limit for his Credit Account was never exceeded, and Company funds were transferred among the Corporate Accounts for which he had sole management.

64. The Defendant hid his fraudulent conduct by limiting other Company employees from accessing the Corporate Accounts.

65. The Defendant also changed the mailing address for the Credit Account's monthly statements to avoid the discovery of his fraudulent conduct.

66. To exemplify the Defendant's pattern of fraudulent conduct, without limitation, below are just a few selected transactions from the Credit Account over the first two weeks of February of 2024:

   a. On February 2, 2024, the Defendant charged $3,3542.11 at Hermès, a luxury fashion house in Paris, France; the Defendant charged $967.69 over three transactions at Nordstrom, a department store; and the Defendant charged $360.00 at Dudes Boutique, a custom fashion clothing boutique.

   b. On February 5, 2024, the Defendant charged $3,177.27 at Gyu Shige Japanese BBQ & Bar, a Japanese restaurant in Fairfax, Virginia; the Defendant charged $6,572.00 at the Gucci store at Tysons Galleria; the Defendant charged $17,899.90 at the Louis Vuitton at Tysons Galleria; the Defendant charged

$4,626.90 at the Prada in McLean Mall; and the Defendant charged $906.09 at Southeast Impression, a Southeast Asian restaurant in Fairfax, Virginia.

c. **On February 5, 2024, the Defendant made two online payments from the Corporate Checking Account to his Credit Account totaling $20,000.00.**

d. On February 6, 2024, the Defendant charged $524.33 at the Ritz Carlton at Tysons Corner.

e. **On February 6, 2024, the Defendant made an online payment from the Corporate Checking Account to his Credit Account totaling $5,000.00.**

f. On February 7, 2024, the Defendant charged $173.00 at China Boy, a Chinese restaurant in Washington, D.C.; and the Defendant charged $1,773.80 at the CVS Pharmacy in Alexandria, Virginia.

g. **On February 7, 2024, the Defendant made an online payment from the Corporate Checking Account to his Credit Account totaling $10,000.00.**

h. On February 8, 2024, the Defendant charged 17 transactions on Amazon ranging between $5.73 to $104.86; the Defendant charged $123.63 at Life's Abundance, Inc., a pet food supplier; the Defendant charged $5,840.60 at Prada; the Defendant charged $463.50 at Top Dogg, LLC, a pet care company; and the Defendant charged $41.37 for Starlink Internet.

i. On February 9, 2024, the Defendant charged $100.34 at 1799 Prime Steak & Seafood, a restaurant in Alexandria, Virginia; the Defendant charged 8 transactions on Amazon ranging between $4.32 to $317.95; the Defendant charged 48.56 at Wawa; and the Defendant charged $67.50 at the Metropolitan Washington Airports Authority at Reagan National Airport.

    j. On February 12, 2024, the Defendant charged $845.84 at Advance Auto Parts; the Defendant charged $18.01 for Amazon Music; the Defendant charged 37 transactions on Amazon ranging from $8.09 to $169.07; the Defendant charged $412.32 at the Morrison House Old Town Alexandria, a four star Marriott hotel; and the Defendant charged $424.94 at Westside Lilo's Cafe, an American restaurant in Seligman, Arizona.

    k. On February 13, 2024, the Defendant charged $1,788.12 over two transactions at the CVS Pharmacy in Alexandria, Virginia; and the Defendant charged $334.75 at Top Dogg, LLC, a pet care company.

    l. On February 14, 2024, the Defendant charged $1,791.70 to American Airlines; the Defendant charged $2,254.00 to American Modern Insurance, a home insurance provider; the Defendant charged $9,000.00 to Brandon Exotic, an exotic animal pet store with a location in Virgina; and the Defendant charged $74.00 for the Horse World Expo, an equestrian industry trade show.

67. None of the charges specifically identified above were authorized by the Company, for a legitimate business purpose, or reimbursed by the Defendant.

68. A true and accurate copy of the Summary for the Credit Account from January 26, 2024 to February 23, 2024, evidencing the charges set forth above, is attached hereto as **Exhibit 1**.

69. A true and accurate copy of the Summary for the Credit Account from February 23, 2024 to March 25, 2024, evidencing the charges set forth above, is attached hereto as **Exhibit 2**.

70. In February of 2024, the Defendant charged his Credit Account in amounts

exceeding One Hundred Thousand Dollars ($100,000.00) and made numerous transfers from the Company Checking Account to pay off these charges.

71.     The Defendant's fraudulent pattern of conduct continued throughout 2024 and until its discovery in February of 2025.

72.     Additionally, on May 5, 2024, the Defendant executed a payroll change order to give himself a substantial raise.

73.     The Company did not authorize the Defendant to give himself a raise and was not notified of the change.

74.     The Company promptly terminated the Defendant's employment after discovering his fraudulent scheme.

## COUNT I – FRAUD

75.     Each and every allegation contained in the foregoing paragraphs is incorporated by reference as if fully set forth herein.

76.     From at least January of 2024 until February of 2025, the Defendant defrauded the Company by, among other things, regularly charging personal expenses to his Credit Account without authorization or reimbursement to the Company, and paid these expenses with funds from the Company Checking Account.

77.     As the Company's CFO, the Defendant owed the Company fiduciary duties and was obligated to responsibly manage and report the Company's finances, accounting functions, payroll employee, benefits functions, and compliance

78.     The Defendant made numerous affirmative false representations to the Company, including without limitation, (a) that the Company's financial distress was due to legitimate business expenses, (b) that the Company was facing financial difficulties due to increased market

rates for labor and materials, (c) that that the Company's financial difficulties would be resolved if the Company increased its operations, (d) that he was properly managing the Corporate Accounts, (e) executing a payroll change order representing that he was authorized to increase his salary.

79. The Defendant knew these representations were false.

80. The Defendant made these representations with the intention that the Company would rely on them.

81. The Company justifiably relied on the Defendant's misrepresentations.

82. The Defendant intentionally concealed and failed to disclose his fraudulent conduct by, among other things, (a) avoiding the production of written financial reports to the Company's management, (b) hiding his numerous fraudulent charges to the Credit Account, (c) misrepresenting the Company's finances and financial status, (d) keeping the fraudulent charges below the credit limit of his Credit Account, (e) paying off the fraudulent charges on the Credit Account from the Company Checking Account, both of which he personally and solely managed, and failing to reimburse the Company for such charges, (f) and unilaterally giving himself a salary raise without requisite approval or notice to anyone else in the Company.

83. The Company took action in justifiable reliance on the Defendant's concealment, such as (a) not investigating the true cause of the Company's financial distress, (b) increasing operations to compensate for the purported increases in business expenses to the Defendant's benefit, (c) reporting taxes based on the Defendant's representations, (d) continuing the Defendant's employment with the Company, (e) continuing to deposit payments from clients to the Company Checking Account which the Defendant then unlawfully misappropriated.

84. The Company has suffered significant damages as a direct and proximate result of

the Defendant's intentional fraud and concealment in excess of One Million Dollars ($1,000,000).

**WHEREFORE**, the Plaintiff, Amaryllis, Inc., respectfully requests that judgment be entered in its favor and against the Defendant, Perry Adler, in an amount exceeding $75,000, to be determined at trial, plus punitive damages, interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

## COUNT II - CONVERSION

85. Each and every allegation contained in the foregoing paragraphs is incorporated by reference as if fully set forth herein.

86. The Defendant diverted discrete, specifically identifiable sums belonging to the Company by charging personal expenses to the Credit Account and paying off these charges with a series of periodic transfers from the Company Checking Account and without reimbursement by the Defendant.

87. The Defendant also diverted discrete, specifically identifiable sums belonging to the Company by giving himself a salary raise without authorization or notice to the Company.

88. The Defendant did not have a personal possessory interest in the credit balance on the Credit Account, nor the funds that he fraudulently transferred from the Company Checking Account to the Credit Account.

89. The Defendant did not have a personal possessory interest in the funds diverted to his account as a result of him executing a change order to raise his salary.

90. The Company had the sole possessory interest in the funds which the Defendant unlawfully diverted.

91. The Defendant incurred fraudulent charges to the Credit Account and made these

fraudulent transfers from the Company Checking Account to the Credit Account without permission or justification.

92. The Defendant conducted his fraud scheme with actual malice, intentionally, and in reckless disregard for the rights of the Company.

93. The Company has suffered significant damages as a direct and proximate result of the Defendant's conversion in excess of One Million Dollars ($1,000,000).

**WHEREFORE**, the Plaintiff, Amaryllis, Inc., respectfully requests that judgment be entered in its favor and against the Defendant, Perry Adler, in an amount exceeding $75,000, to be determined at trial, plus punitive damages, interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

## COUNT III – NEGLIGENCE

94. Each and every allegation contained in the foregoing paragraphs is incorporated by reference as if fully set forth herein.

95. The Defendant owed the Company various fiduciary and other duties as an employee and as the Company's CFO, such as (a) responsibly using the Credit Account only for authorized transactions, (b) responsibly managing the Company's finances and accounting, (c) responsibly managing e the Corporate Accounts, (d) completely, accurately, and timely reporting the Company's finances and accounting, (e) identifying and managing financial risks, (f) paying for any personal charges, and (g) managing the Company's payroll, including employee raises.

96. The Defendant breached his duties to the Company by, among other things, (a) defrauding the Company in excess of One Million Dollars ($1,000,000), (b) failing to responsibly manage the Company's finances and accounting, (c) failing to responsibly manage the Corporate Accounts, (d) failing to timely, completely, and accurately report on the

Company's finances and accounting, (e) using the Credit Account for unauthorized transactions, (f) failing to reimburse the Credit Account or the Company for personal charges, and (g) executing a change order to raise his salary without authorization or notice to the Company.

97. The Company has suffered significant damages as a result of the Defendant's negligence, well upwards of a million dollars.

**WHEREFORE**, the Plaintiff, Amaryllis, Inc., respectfully requests that judgment be entered in its favor and against the Defendant, Perry Adler, in an amount exceeding $75,000, to be determined at trial, plus punitive damages, interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

## COUNT IV – BREACH OF FIDUCIARY DUTY

98. Each and every allegation contained in the foregoing paragraphs is incorporated by reference as if fully set forth herein.

99. The Defendant owed the Company a fiduciary duty by virtue of his position as the Company's CFO.

100. The Defendant breached his fiduciary duties due to his fraud, conversion, and negligence, as set forth herein.

101. The Company has suffered significant damages as a result of the Defendant's breach of his fiduciary duties, well upwards of a million dollars.

**WHEREFORE**, the Plaintiff, Amaryllis, Inc., respectfully requests that judgment be entered in its favor and against the Defendant, Perry Adler, in an amount exceeding $75,000, to be determined at trial, plus punitive damages, interest, costs and expenses, including attorneys' fees, and such other and further relief as this Court deems just and proper.

|  |  |
|---|---|
| | Respectfully submitted, |
| Dated: March 5, 2025 | |
| | */s/ Tyler J. Creevy* |
| | Gerard P. Martin (Bar No. 00691) |
| | Tyler J. Creevy (Bar No. 30485) |
| | Rosenberg Martin Greenberg, LLP |
| | 25 S. Charles St., 21st Floor |
| | Baltimore, MD 21201 |
| | (T) 410-277-6600 |
| | GMartin@rosenbergmartin.com |
| | TCreevy@rosenbergmartin.com |
| | |
| | *Attorneys for Plaintiff Amaryllis, Inc.* |